## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket No. 3:19-cv-00450 |
| | ) | |
| ATS AUTOMATION GLOBAL SERVICES USA, INC.; ATS ASSEMBLY AND TEST, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## ANSWER AND COUNTERCOMPLAINT

---

Defendants ATS Automation Global Services USA, Inc. ("ATS Automation") and ATS Assembly and Test, Inc. ("ATS Assembly") (collectively, "Defendants"), by and through counsel, respectfully submit this Answer and Counterclaim in response to the Complaint filed by Plaintiff Nissan North America, Inc. ("Nissan"):

1.     It is admitted that the Complaint contains causes of action for breach of contract and misrepresentation. All remaining allegations in Paragraph 1 are denied.

2.     The first two sentences in Paragraph 2 are admitted. These Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2.

3.     It is admitted that ATS Automation is a Delaware corporation with its principal place of business in Lewis Center, Ohio, and that ATS Automation is engaged in the business of designing and manufacturing automated testing systems. It is further admitted that ATS Automation Tooling Systems Inc. is the parent company to the parent company of ATS Automation. Additionally, it is admitted that

ATS Automation Tooling Systems Inc. is a Canadian corporation with its principal place of business in Ontario, Canada. All remaining allegations in Paragraph 3 are denied.

4. It is admitted that ATS Assembly is a Michigan corporation with its principal place of business in Wixom, Michigan. It is further admitted that ATS Automation Tooling Systems Inc. is the parent company to the parent company of ATS Assembly. Additionally, it is admitted that ATS Automation Tooling Systems Inc. is a Canadian corporation with its principal place of business in Ontario, Canada. All remaining allegations in Paragraph 4 are denied.

## JURISDICTION

5. This federal District Court has subject matter jurisdiction over this action pursuant to 13 U.S.C. § 1332. It is admitted that the document entitled "Terms and Conditions" contains a section entitled "Choice of Forum/Venue" that states, "All actions or proceedings arising in connection with this purchase order shall be tried and litigated exclusively in state courts located in Rutherford County, State of Tennessee." However, it is denied that the subject provision divests this federal District Court of subject matter jurisdiction over this case. All remaining allegations in Paragraph 5 are denied.

6. This federal District Court has personal jurisdiction over these Defendants. It is admitted that the document entitled "Terms and Conditions" contains a section entitled "Choice of Forum/Venue" stating that "[a]ll actions or proceedings arising in connection with this purchase order shall be tried and litigated exclusively in state courts located in Rutherford County, State of Tennessee" and "SELLER WAIVES ANY RIGHT IT MAY HAVE . . . TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS." However, it is denied that

2

the subject provision divests this federal District Court of personal jurisdiction over these Defendants. All remaining allegations in Paragraph 6 are denied.

7.     Venue is proper in this federal District Court. It is admitted that the document entitled "Terms and Conditions" contains a section entitled "Choice of Forum/Venue" that states, "SELLER WAIVES ANY RIGHT IT MAY HAVE TO . . . OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION."  However, it is denied that the subject provision constitutes a waiver of Defendants' right to remove this matter to the appropriate United States District Court. All remaining allegations in Paragraph 7 are denied.

## FACTS

8.     Admitted.

9.     It is admitted that ATS Automation submitted a proposal to Nissan in June of 2017, and that the proposal included installation. Any other allegations in Paragraph 9 that are inconsistent with the proposal are denied.

10.     It is admitted that ATS Automation may have sent representatives to Nissan's Decherd plant at or near the time of the proposal. All remaining allegations in Paragraph 10 are denied.

11.     It is admitted that Nissan selected ATS Automation's proposal and that a Purchase Order Amendment was submitted by Nissan on or around June 23, 2017. It is further admitted that the Purchase Order Amendment incorrectly identified the vendor as:

ATS ASSEMBLY AND TEST INC
ATS 313 MOUND STREET
DAYTON OH 45402

3

It is denied that the Purchase Order Amendment was signed. It is further denied that ATS Assembly has ever entered into any contracts with Nissan. All remaining allegations in Paragraph 11 are denied.

12. It is admitted that the document titled "Terms and Conditions" states that "time is of the essence." It is further admitted that the document titled "Terms and Conditions" states, "Seller shall not assign, sublet or transfer this purchase order, or any part thereof, or any payment due or to become due hereunder, without prior written consent of Nissan, and any such assignment, subcontract or transfer without such written consent shall be null and void." However, it is denied that the subject provisions have not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. All remaining allegations in Paragraph 12 are denied.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

17. These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates of any text messages received by Nissan. All remaining allegations in Paragraph 17 are denied.

18. These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates of any text messages received by Nissan. All remaining allegations in Paragraph 18 are denied.

19. These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates

4

of any text messages received by Nissan. All remaining allegations in Paragraph 19 are denied.

20.     These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates of any text messages received by Nissan. All remaining allegations in Paragraph 20 are denied.

21.     These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates of any text messages received by Nissan. All remaining allegations in Paragraph 21 are denied.

22.     These Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations concerning the existence, content, or dates of any text messages received by Nissan. All remaining allegations in Paragraph 22 are denied.

23.     It is admitted that ATS personnel visited Nissan's Decherd plant in Tennessee on a number of occasions. All remaining allegations in Paragraph 23 are denied.

24.     It is admitted that in June of 2018, Nissan submitted an undated letter to ATS Automation which stated that "Nissan hereby exercises its option to terminate the Contract, pursuant to Sections 3, 4, and 7 of the Contract." It is further admitted that Section 3 of a document titled "Terms and Conditions" contains the language averred. It is denied, however, that either provision is a controlling, effective, or enforceable aspect of any agreement(s) between ATS Automation and Nissan. It is further specifically denied that ATS Automation was in default and that Nissan was entitled to terminate their agreement. All remaining allegations in Paragraph 24 are denied.

5

25.    It is admitted that the subject letter stated, "Nissan hereby demands that ATS promptly return to it the balance paid of $743,115.60 plus additional costs of $765,021.98 incurred by Nissan on account of ATS's delay." It is admitted that ATS Automation did not acquiesce to this demand, and it is specifically denied that ATS Automation owed or owes any money to Nissan. All remaining allegations in Paragraph 25 are denied.

26.    Denied.

## Count I – Breach of Contract

27.    These Defendants incorporate their responses to Paragraphs 1–26 of the Complaint as if fully set forth herein.

28.    The allegations in Paragraph 28 are denied with respect to ATS Assembly. It is further specifically denied that ATS Assembly has ever entered into any contracts with Nissan. It is admitted that the contract between ATS Automation and Nissan required Nissan to pay for the subject equipment. While it is admitted that the parties discussed target delivery dates, it is denied that the agreement between ATS Automation and Nissan included a specific agreed deadline for delivery and installation. Moreover, the course of dealing between the parties required changes to the contract that affected the ability to meet any target delivery dates. All remaining allegations in Paragraph 28 are denied.

29.    Denied. It is further specifically denied that ATS Assembly has ever entered into any contracts with Wixom.

30.    It is admitted that ATS Automation's proposal is incorporated into the original agreement with Nissan, but it is denied that the proposal unconditionally required ATS Automation to provide the equipment thirty weeks from receipt and acceptance of the purchase order. All remaining allegations in Paragraph 30 are denied.

6

31.    It is admitted that the Purchase Order Amendment states that a document titled "General Terms and Conditions of Contract" forms "a part of this Purchase Order." While it is admitted that the document titled "General Terms and Conditions of Contract" states that "Contractor shall prosecute the Work in a prompt, diligent, and workmanlike manner," it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties.  It further is denied that ATS Automation did not prosecute the work in a prompt, diligent, and workmanlike manner to the extent that it was not prevented from doing so by Nissan. Additionally, it is denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 31 are denied.

32.    It is admitted that Section 3(a) of the document titled "General Terms and Conditions of Contract" states that "[a]ny materials that are to be furnished by Contractor hereunder shall be furnished in sufficient time to enable Contractor to perform and complete the Work within the time or times required by Nissan." However, it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. It is further denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 32 are denied.

33.    It is admitted that Section 3(c) of the document titled "General Terms and Conditions of Contract" states that "Contractor shall give Nissan full information in advance as to its plans for carrying on each part of the Work." However, it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. It is further denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 33 are Denied.

7

34.    It is admitted that Section 13 of the Document titled "Terms and Conditions" states "Seller shall not assign, sublet or transfer this purchase order, or any part therof, or any payments due or to become due hereunder, without prior written consent of Nissan, and any such assignment, subcontract or transfer without such written consent shall be null and void." However, it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. It is further denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 34 are denied.

35.    It is admitted that Section 6(e) of the Document titled "General Terms and Conditions of Contract" states "Contractor agrees to perform work in a manner that will not injure, damage or delay the Project or work of other contractors on the Project." However, it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. It is further denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 35 are denied.

36.    It is admitted that Section 6(e) of the document titled "General Terms and Conditions of Contract" states that "Contractor agrees to pay the Nissan such other additional damages as the Nissan itself may sustain by reason of such delay by the Contractor." However, it is denied that the subject provision has not been modified, waived, or superseded by subsequent agreement or the course of dealing between the parties. It is further denied that ATS Assembly is a party to any agreement with Nissan. All remaining allegations in Paragraph 36 are denied.

37.    It is admitted that Tennessee law implies into all contracts a covenant of good faith and fair dealing. All remaining allegations in Paragraph 37 are denied.

38.    Denied. It is further specifically denied that Nissan has suffered any damages.

## Count II – Fraud and Misrepresentations

39. These Defendants incorporate their responses to Paragraphs 1–38 of the Complaint as if fully set forth herein.

40. Denied.

41. Denied.

42. Denied. It is further specifically denied that Nissan has suffered any damages.

## AFFIRMATIVE DEFENSES

For further affirmative defense, these Defendants would state as follows:

43. Nissan has failed to state a claim for breach of contract against ATS Assembly under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The proposal was submitted by ATS Automation. Though Nissan mistakenly identified "ATS ASSEMBLY AND TEST INC" as the vendor on its Purchase Order Amendment, the Purchase Order Amendment could not have created a contract between Nissan and ATS Assembly because ATS Assembly had not submitted an offer to Nissan. Tellingly, Nissan addressed its purported termination letter to ATS Automation, not ATS Assembly. To the extent that ATS Assembly was involved in the project, it functioned solely as an agent of ATS Automation. Because there is no contract between Nissan and ATS Assembly, Nissan cannot state a claim for breach of contract against ATS Assembly.

44. Alternatively, if the Court determines that there is a valid and enforceable contract between Nissan and ATS Assembly, Nissan's claim for breach of contract against ATS Automation should be dismissed for failure to state a claim under Rule 12(b)(6). The contract clearly contemplates one buyer and one seller. Nissan cannot hold both ATS Automation and ATS Assembly liable for breach of contract.

9

45.    Nissan has failed to plead fraud with the particularity required by Rule 9(b). Under Rule 9(b), Nissan is required to "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 883 (N.D. Ohio 1998)). To this end, where, as here, "the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient." *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 659 (M.D. Tenn. 2001). Nissan does not attribute any of the purportedly fraudulent statements to ATS Assembly – only to "ATS" or "Defendants." Moreover, the alleged misrepresentations are merely promises as to future conduct and thus cannot give rise to a claim for fraud or misrepresentation. *See, e.g.*, *Dog House Investments, LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) (explaining that a "primary element[]" of an action for fraud is "'that the misrepresentation relates to an existing or past fact'"). As such, Nissan has failed to state a claim for fraud or misrepresentation under Rule 12(b)(6).

46.    There has been a total or partial failure of consideration excusing ATS Automation and/or ATS Assembly from performance. After accepting the proposal, Nissan materially altered the specifications, design, and/or other features of the leak test cell; required ATS Automation to subcontract out certain tasks for an excessive price at ATS Automation's expense; "mandated" that Nissan deliver the nonfunctioning equipment to Nissan's facility; reneged on its agreement that Nissan would assemble and debug the equipment at the Nissan facility; took actions forcing ATS Automation to relocate the equipment to the Wixom facility; and demanded that ATS Automation commit to an unreasonable delivery timeline. Nissan's actions hindered and delayed progress on the equipment and caused great additional expense

10

to ATS Automation and/or ATS Assembly in an amount exceeding the value of the proposal or any benefit that ATS Automation and/or ATS Assembly would have received by virtue of any agreements with Nissan.

47. Alternatively, any delay and/or nondelivery by ATS Automation and/or ATS Assembly is excused pursuant to § 47-2-615 of the Tennessee Code and/or the common-law doctrine of impossibility of performance because Nissan's conduct rendered performance as agreed impracticable.

48. Nissan has waived the contractual provisions on which it seeks to rely by virtue of its conduct. This includes but is not limited to: waiver of performance by or on a particular date by acquiescing in and/or causing or contributing to repeated delays; waiver of any right to prior approval of subcontractors or assignments by acquiescing in the use of same and forcing ATS Automation to subcontract or assign portions of the project; and waiver of any right to written contract modifications and/or written change orders by making and/or agreeing to alterations that were not reduced to writing and/or treating such alterations as valid and binding; waiver of any breaches due to conduct manifesting Nissan's intention to regard the agreement(s) as in full force.

49. Nissan's claims are barred by the doctrine of equitable estoppel. Nissan required ATS Automation to deliver the product to Nissan in a nonfunctioning condition; disassembled the equipment upon delivery; shipped a portion of the disassembled equipment to a third party without informing Defendants; agreed that it would be responsible for assembling and debugging the equipment; and then announced that ATS Automation would need to reassemble and complete the equipment without any support from Nissan. ATS Automation lacked knowledge or means of knowledge as to Nissan's true intentions and changed its position prejudicially in reliance upon Nissan's conduct by complying with its various requests and demands.

11

50.     If Nissan suffered any damages as a result of the conduct of ATS Automation or ATS Assembly, it has failed to take reasonable steps to minimize the amount of damages experienced or avoid further loss. Because Nissan has failed to mitigate its damages, Nissan's recovery, if any, must be reduced by the amount of damages that could have been reasonably avoided.

## COUNTERCOMPLAINT

By way of counterclaim against Nissan, Defendants would respectfully show the Court as follows:

1.     On May 22, 2017, Nissan requested quotations for the engineering, design, fabrication, and installation of an automated system to test V8 cylinder blocks for leaks.

2.     Leak test systems are highly technical pieces of equipment that must be engineered with precision. They are not a one-size-fits all machine. Rather, they are specifically tailored to the needs of their intended user and the requirements and restrictions of their intended environment. Successful production of a leak test system requires great engineering and machining expertise and precise adherence to specifications. The slightest change often requires a complete redesign, and the slightest inaccuracy in the underlying data means that the product will not perform as designed or intended.

3.     On June 19, 2017, ATS Automation submitted a proposal in response to Nissan's request for quotations (the "Proposal").

4.     The Proposal's total system price was $825,684.

5.     The Proposal stated that "lead time for [the] equipment [was] estimated at (30) weeks to ready to ship from, and subject to finalization at the time of, ATS's written acceptance of customer purchase order." It specified that "[a]bility to meet this timing is predicated upon" a number of factors, including "[a]availability to all materials, part drawings, models, etc at inception of project" and "[t]ime required for

12

return of concepts and approvals." It further stated that "ATS will not be responsible for delays beyond our control; such delays may affect timing and/or cost."

6.      The Proposal further provided that it was based on the information provided by Nissan to date and that any changes "may impact the design, pricing, and/or delivery schedule of the equipment." Moreover, it stated that "[i]f a specific requirement is not expressed in the customer specification, it will be deemed to be outside of scope of the project." Additionally, the Proposal specified that it "is based on the equipment as quoted. Any change in ATS or Nissan specific sub-suppliers for similar equipment may result in a change to our proposal." It further reiterated that "[c]hanges to any of the assumptions or clarifications used in the development of this proposal could affect the design, price, and delivery of the equipment."

7.      The Purchase Order Amendment accepting the Proposal describes the payment terms as follows: "Milestones with 10% retention held each invoice. Payment released Net 45 days with retention released with acceptance…. Invoice is not required for retention release."

8.      After accepting the Proposal, Nissan changed or modified the product specifications, design, and/or other features of the leak test cell on multiple occasions, causing significant delay and great expense to ATS Automation.

9.      On or around September of 2017, Nissan requested the addition of a second set of tooling plates. The original design only called for one set of tooling plates. This modification caused a significant delay.

10.      Additionally, Nissan required ATS Automation to contract out, at ATS Automation's expense, much of the machining work, including both sets of tooling plates, to ALL-TEC Machinery Repair, LLC ("ALL-TEC") located in Winchester, Tennessee. The fees charged by ALL-TEC totaled $232,560, which was more than double the estimates provided by ALL-TEC competitors for the same work. Moreover,

the grossly excessive fees charged by ALL-TEC far exceeded what it would have cost ATS Automation to perform the work itself.

11.     On or around September or October of 2017, Nissan requested the addition of 28 thru hole checks. This modification caused a significant delay.

12.     The data originally provided by Nissan reflected a finished block surface condition, and ATS Automation predicated its design on that data. On or around October 2017, Nissan informed ATS Automation that the block would not be finished and ATS Automation should instead design for surfaces with a .5mm stock. This modification caused a significant delay.

13.     The data originally supplied by Nissan was also inaccurate in the sense that it omitted certain equipment from the factory layout. This inaccuracy necessitated significant modifications, as the original design had been premised on the data as provided by Nissan.

14.     The above-described modifications cost ATS Automation over $ 450,000 in  incurred expenses and additional costs.

15.     On November 2, 2017, ATS Automation informed Nissan that installation prior to the Christmas shutdown was likely infeasible.

16.     In its November 2, 2017 correspondence to Nissan, ATS Automation expressed that it was "committed to minimizing the impact of" the delay. To this end, ATS Automation offered "to send in a Technical Solutions team early [the] next week to assist with minimizing" the downtime Nissan experienced with its current equipment, at the expense of ATS Automation.

17.     Over the following months, ATS Automation was in continuous contact with Nissan about the status of the project and design modifications.

18.     On February 22, 2018, Nissan wrote to ATS Automation, stating, "[P]lease let us know when the Nissan Leak test station can be broken down and made ready to ship *in the current condition*. Or do you prefer that we bring our group

14

up to disassemble and get ready for shipment? Either way, *we [Nissan] will complete this project*. That seems to be our only alternative." (emphasis added).

19.　The parties established a target shipping date in mid-March.

20.　In the weeks leading up to the target shipping date, ATS Automation informed Nissan of difficulties encountered and slight progress delays resulting from those difficulties.

21.　Nissan remained adamant that ATS Automation relinquish the equipment to Nissan, regardless of its condition. On March 7, 2018, Nissan informed ATS Automation that "the shipping date will not change, the machine *must ship on [March] 19th running or not*," and noted that "if the machine ships in a non-running condition the funds that are being held in retention will not be released to ATS." Likewise, on March 12, Nissan reiterated that "the machine will ship on the 19th regardless of condition, however if the machine does not ship in a complete running condition the funds held in retention will not be released."

22.　On or around March 15, Nissan representatives travelled to the ATS facility, aware that the machine would not be complete by March 19. As set forth in the Proposal, Factory Acceptance Testing was conducted in the presence of Nissan representatives prior to shipment of the equipment. The equipment did not pass any of the tests, but Nissan agreed to accept the equipment anyway.

23.　The March 15, 2018 FAT (Factory Acceptance Testing) Record  ("FAT Record") signed by Nissan reflects a March 17 shipping date.  The option for "accepted as is" is selected. Nissan added a note stating, "Nissan Decherd is not accepting this equipment 'As is', *we have mandated that ATS ship the station in a non-functioning, un-commissioned state* so that transparent work can progress to minimize loss to Nissan." (emphasis added).

24.     To the best of Defendants' knowledge, Nissan received the product on or around March 20 and, shortly thereafter, began disassembling the equipment part-by-part. It also shipped portions of the equipment to ALL-TEC.

25.     On March 21, 2018, Nissan proposed that ATS Automation pay for ALL-TEC to assemble the machine and bring it to full functionality, though ALL-TEC lacked experience with leak test equipment and was not qualified to perform the work. ALL-TEC had provided a quote (dated March 20, 2018) reflecting an estimated cost of $60,000. The quote noted that the estimate was made "with very little known about what all has to be done" and "only a small amount of redesigned machining [was] included in [the] estimate." This suggestion was declined.

26.     On or around April 2, 2018, the parties agreed that ATS Automation would be responsible for certain tasks that were primarily related to design modifications. The parties agreed that Nissan would be responsible for reassembling the equipment at its plant, debugging, and approving design changes.

27.     ATS Automation worked diligently on the design modifications and obtaining the requisite approval from Nissan. Nevertheless, after the highly technical equipment was systemically disassembled by Nissan, it sat idle on the factory floor until Nissan eventually told ATS Automation to come put it back together.

28.     More specifically, On May 15, 2018, Nissan announced that, contrary to the prior arrangement between the parties, Nissan would not reassemble the product or debug it, nor would it provide any support for those tasks. Nissan informed ATS Automation that it could either work on the equipment at the Nissan plant or remove the equipment to work on it elsewhere.

29.     In reliance on these instructions from Nissan, ATS Automation elected to remove the equipment to a facility in Wixom, Michigan because the Nissan plant was not suited for the necessary tasks.

16

30. The equipment was received at the Wixom facility on or around May 21, 2018, and ATS Automation began reassembly.

31. ATS Automation provided a schedule to Nissan under which the equipment would arrive at Nissan's plant in late July. Nissan, in turn, demanded that ATS Automation ship the equipment by July 5, 2018. The parties held a meeting on or around June 12, 2018, and ATS Automation explained that a July 5 shipping date was not practicable.

32. On or around June 12 or 13, 2018, ATS Automation received a letter from Nissan purporting to terminate the contract and demanding the receipt of $1,508,137.58 on or before June 19.

33. ATS Automation's efforts between May 15, 2018, and its receipt of the purported termination letter came at great expense. ATS Automation incurred over $150,000 in set up, testing, employee overtime, and expediting costs. ATS Automation would not have incurred these expenses if Nissan had not demanded delivery of the nonfunctioning equipment in March, disassembled the equipment, and then reneged on its agreement to reassemble the equipment.

34. On June 19, 2018, ATS Automation sent a response letter to Nissan, stating:

> As you know, since receiving [your] letter we have spoken with Joel Langham from Nissan's Engineering team and we are arranging a conference call with the broader team for later this week to review our progress and the next steps for the project. We are confident that we can amicably address the issues raised in your letter, and we look forward to your cooperation.

35. On July 22, 2018, ATS Automation wrote to Nissan, stating that "ATS continues to cooperate with Nissan Engineering to amicably address the issues raised in your letter" and inviting Nissan to a demonstration of the equipment.

36. On July 23, 2018, Nissan demanded that ATS Automation wire $1,508,137.58 to Nissan by July 27, 2018.

17

37. On July 25, 2018, ATS Automation responded, noting that it "continue[d] to act in good faith to address issues raised by Nissan" and had "been in regular communication with Nissan."

38. On August 10, 2018, Nissan again demanded that ATS Automation wire $1,508,137.58 to Nissan. It filed this lawsuit in April of 2019.

## Count I – Breach of Contract

39. ATS Automation incorporates the allegations in the preceding Paragraphs as if fully set forth herein.

40. After accepting the Proposal, Nissan modified the specifications and/or design of the equipment on multiple occasions. Nissan further modified the agreement by demanding that ATS Automation pay ALL-TEC to complete certain tasks at a grossly excessive price. Additionally, Nissan's failure to supply accurate data to ATS Automation necessitated subsequent design modifications. Overall, these modifications to the agreement between Nissan and ATS Automation resulted in significant costs and delays.

41. The contract between the parties was further modified when Nissan demanded that the equipment be relinquished to Nissan, agreed to reassemble and debug the equipment at the Nissan facility, and subsequently forced ATS Automation to undertake those tasks. These modifications to the agreement between Nissan and ATS Automation resulted in significant costs and delays.

42. Additionally, Nissan continues to withhold the 10% retention.

43. To the extent that any of the modifications are so inconsistent with the original contract that they cannot stand as supplemental agreements, the doctrine of merger applies and the original contract was merged into the subsequent agreement between the parties.

44. Nissan has materially breached its agreement with ATS Automation by wrongfully repudiating the agreement, demanding that ATS Automation commit to

18

an unreasonable delivery date, terminating the agreement without justification, and failing to pay ATS Automation the additional amounts it is entitled to by virtue of the contract and the various modifications.

45.    As a proximate result of Nissan's breaches of contract, ATS Automation has suffered, and will continue to suffer, damages in an amount to be proven at trial. ATS Automation seeks compensation for all damages and losses proximately caused by Nissan's breaches.

46.    Having pled that ATS Automation is the proper party to bring this counterclaim for breach of contract, these Defendants plead in the alternative that if the Court should find that ATS Assembly was a party to any agreements with Nissan, this counterclaim is asserted on behalf of both Defendants.

## Count II – Breach of Contract

47.    ATS Automation incorporates the allegations in the preceding Paragraphs as if fully set forth herein.

48.    Alternatively, Nissan accepted the goods provided by ATS Automation in March of 2018 and subsequently entered a new agreement for the provision of services with ATS Automation.

49.    Nissan was fully aware of the equipment's nonfunctioning status when it insisted upon delivery of the equipment in March. Nissan signified to ATS Automation that it would take the equipment in spite of its noncomformity. Indeed, Nissan "mandated that ATS ship" the equipment to Nissan in its noncomforming state by March 19, 2018.

50.    Additionally, Nissan acted inconsistent with ATS Automation's ownership of the equipment by disassembling the equipment, sending portions of the equipment to a third party, and maintaining possession of the equipment for nearly two months.

19

51.     Moreover, Nissan's acceptance of the equipment in March of 2018 was not made under the reasonable assumption that ATS Automation would seasonably cure the noncomformities. Nissan informed ATS Automation that it would not pay the retained funds if the equipment shipped in a non-running condition. Moreover, Nissan repeatedly expressed to ATS Automation – both before and after March 15 – that it did not trust ATS Automation and doubted whether ATS Automation was capable of completing the project. Accordingly, Nissan was not entitled to revoke acceptance of the equipment at any time.

52.     The original contract for the sale of equipment between Nissan and ATS Automation thus concluded in March of 2018 when Nissan knowingly accepted the nonconforming goods without a reasonable assumption that the noncomformities would be seasonably cured by ATS Automation.

53.     As such, ATS Automation is entitled to the full value of the contract for sale of equipment, including the retained funds and the costs of all modifications. These modifications include, but are not limited to, various changes to the specifications and/or design of the equipment, Nissan's requirement that ATS Automation pay ALL-TEC to complete certain tasks at a grossly excessive price, and design changes necessitated by Nissan's failure to supply accurate data to ATS Automation. Nissan has materially breached the contract for sale of equipment by failing to pay these amounts owed to ATS Automation.

54.     On or around April of 2018, Nissan and ATS Automation reached a separate agreement for ATS Automation to provide services with respect to the equipment previously accepted by Nissan.

55.     Nissan has materially breached the agreement for services by wrongfully repudiating the agreement, refusing to assemble or debug the equipment as previously agreed,  demanding that ATS Automation commit to an unreasonable

20

delivery date, terminating the agreement without justification, and failing to compensate ATS Automation for services provided.

56.    As a proximate result of Nissan's breaches of the contract for sale of equipment and the contract for services, ATS Automation has suffered, and will continue to suffer, damages in an amount to be proven at trial. ATS Automation seeks compensation for all damages and losses proximately caused by Nissan's breaches.

57.    Having pled that ATS Automation is the proper party to bring this counterclaim for breach of contract, these Defendants plead in the alternative that if the Court should find that ATS Assembly was a party to any agreements with Nissan, this counterclaim is asserted on behalf of both Defendants.

## Count III – Breach of Contract

58.    ATS Automation incorporates the allegations in the preceding Paragraphs as if fully set forth herein.

59.    A duty of good faith and fair dealing is implied in all contracts under Tennessee law. Contracts subject to Tennessee's Uniform Commercial Code contain an additional obligation of "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *See* Tenn. Code Ann. §§ 47-1-304, 47-2-103(b).

60.    Nissan violated this implied duty by taking actions that hindered, delayed, and/or prevented ATS Automation's performance, made performance more difficult, and diminished ATS Automation's benefits or profits under the agreement(s). These actions include but are not limited to the following: materially altering the specifications, design, and/or other features of the leak test cell; providing inaccurate data to ATS Automation; requiring ATS Automation to subcontract out certain tasks for excessive prices at ATS Automation's expense; requiring Nissan to ship the unfinished equipment to Nissan's facility; disassembling the equipment and then allowing it to sit idle on the factory floor for weeks or months; refusing to

21

assemble and debug the equipment as previously agreed; and placing unreasonable time constraints on ATS Automation's performance.

61. Nissan has breached its contract(s) with ATS Automation by violating the implied duty of good faith and fair dealing.

62. As a proximate result of these breaches of contract, ATS Automation has suffered, and will continue to suffer, damages in an amount to be proven at trial. ATS Automation seeks compensation for all damages and losses proximately caused by Nissan's breaches.

63. Having pled that ATS Automation is the proper party to bring this counterclaim for breach of contract, these Defendants plead in the alternative that if the Court should find that ATS Assembly was a party to any agreements with Nissan, this counterclaim is asserted on behalf of both Defendants.

### Count IV – Promissory Estoppel

64. ATS Automation incorporates the allegations in the preceding Paragraphs as if fully set forth herein.

65. As detailed above, Nissan made certain representations or promises to ATS Automation that Nissan should reasonably have expected to induce action or forbearance by ATS Automation. For example, Nissan directed ATS Automation to ship the equipment to Nissan and stated that Nissan would finish the project. It later promised ATS Automation that it would reassemble and debug the equipment at the Nissan facility.

66. ATS Automation took actions in reasonable reliance on these and other representations by Nissan. These actions include but are not limited to delivering the nonfunctioning equipment to Nissan and performing design work while Nissan was in possession of the equipment. ATS Automation also refrained from taking certain actions – such as relocating the equipment or performing reassembly work on the equipment at the Nissan plant – in reliance on Nissan's promises.

22

67.     ATS Automation experienced a substantial financial loss due to its reliance on Nissan's representations and promises. This detriment to ATS Automation was reasonably foreseeable to Nissan.

68.     As a direct and proximate result of Nissan's conduct, ATS Automation has suffered, and will continue to suffer, damages in an amount to be proven at trial. ATS Automation seeks compensation for all damages and losses proximately caused by Nissan's conduct.

69.     Having pled that ATS Automation is the proper party to bring this counterclaim for promissory estoppel, these Defendants plead in the alternative that if the Court should find that ATS Assembly was a party to any transactions with Nissan, this counterclaim is asserted on behalf of both Defendants.

### Count V – Unjust Enrichment

70.     ATS Automation incorporates the allegations in the preceding Paragraphs as if fully set forth herein.

71.     In the alternative that there is no contract between the parties covering the work performed by ATS Automation after delivery of the equipment to Nissan or the contract has become unenforceable or invalid, ATS Automation is entitled to recover for these services under the theory of unjust enrichment.

72.     ATS Automation provided valuable design services that Nissan received.

73.     Nissan should reasonably have understood that ATS Automation expected to be compensated for the design services provided after Nissan accepted delivery of the equipment.

74.     It would be unjust for Nissan to retain the design services without payment.

75.     ATS Automation seeks damages for Nissan's unjust enrichment in an amount to be proven at trial.

23

76. Having pled that ATS Automation is the proper party to bring this counterclaim for unjust enrichment, these Defendants plead in the alternative that if the Court should find that ATS Assembly was a party to any transactions with Nissan, this counterclaim is asserted on behalf of both Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendants respectfully pray that judgment be entered in their favor and against Nissan as follows:

1. An award not to exceed $1,000,000 in compensatory damages;

2. Pre and post-judgment interest;

3. An award of reasonable attorneys' fees and costs; and

4. Such other and further relief as the Court deems proper.

Respectfully submitted this 19th day of June, 2019.

**PAINE, TARWATER, and BICKERS, LLP**

/s Dwight E. Tarwater
Dwight E. Tarwater (BPR # 007244)
det@painetar.com
Lindsey M. Collins (BPR # 033426)
lmc@painetarwater.com
900 South Gay Street, Suite 2200
Knoxville, Tennessee 37902
(865) 525-0880
*Attorneys for ATS Automation Global Services USA, Inc. and ATS Assembly and Test, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing *Answer and Countercomplaint* has been properly served on the following in the manner specified:

<u>Via CM/ECF</u>
George Nolan
Leader, Bulso & Nolan, PLC
414 Union Street, Suite 1740
Nashville, Tennessee 37219
gnolan@leaderbulso.com


This the 19th day of June, 2019.


/s Dwight E. Tarwater
Dwight E. Tarwater